# EXHIBIT E



2007

# Medical Staff Bylaws & Rules and Regulations

Miami VA Healthcare System

## 2007 BYLAWS OF THE MEDICAL STAFF

## MIAMI VA HEALTHCARE SYSTEM, MIAMI, FLORIDA

## TABLE OF CONTENTS

Preamble ...................................................................................................................2

Article I.            Medical Staff Structure ...................................................................3

Article II.           Criteria and Qualifications for Appointment...........................4

Article III.          Clinical Service Chiefs....................................................................4

Article IV.           Medical Executive Council .............................................................5

Article V.            Professional Standards Board ......................................................7

Article VI.           Clinical Service Chief Council ......................................................7

Article VII.          Credentialing, Privileging and Appointment ...........................8

Article VIII.         Corrective Actions and Fair Hearing.........................................8

Article IX.           Amendments to the Bylaws ...........................................................8

Article X.            Rules..................................................................................................9

Article XI.           Rescission .........................................................................................9

Attachment A.        Credentialing and Privileging…………………………………10

Attachment B.        Fair Hearing and Appeals Process for Medical Staff…………….21

Attachment C.         Rules of the Medical Staff…………………………………….…26

## 2007 BYLAWS OF THE MEDICAL STAFF

## VETERANS AFFAIRS HEALTHCARE SYSTEM, MIAMI, FLORIDA

The Miami Veterans Affairs Healthcare System (VAHCS) consists of a tertiary care facility and several outpatient facilities that are all part of the Veterans Health Administration (VHA) headquartered in Washington, D.C.  It is also affiliated with the University of Miami Miller School of Medicine and the Jackson Health System of Miami, Florida.  There is a single, organized, self-governing medical staff that provides oversight for a uniform quality of patient care, treatment, and services provided by practitioners with privileges or scopes of practice.  The medical staff reports to and is accountable to the governing body.   The Secretary of Veterans Affairs and the Under Secretary for Health have delegated governing body status to the Director of the area Veterans Integrated Service Network (VISN) with the Director of the Miami VAHCS serving as the local governing body.

These Bylaws initiated and developed by the medical staff describe the organizational structure of the medical staff, the rules for self-governance, and the accountability to the governing body.  The medical staff shall enforce and comply with these Bylaws.  The governing body approves and complies with the medical staff Bylaws.  Neither the medical staff nor the Director shall unilaterally modify these Bylaws.

All members of the medical staff are subject to these Bylaws and all applicable VAHCS and VHA policies and procedures, and Federal law and regulations.  Each applicant for appointment and each current member of the medical staff must be oriented to these Bylaws and applicable policies and procedures.  They must also receive a copy of these Bylaws and applicable policies and procedures or have ready access to them.  Members of the medical staff must be notified in writing and provided a copy of, or have ready access to, the revised text when significant changes are made in these Bylaws and applicable policies and procedures.

VAHCS policies and procedures specific to this medical staff (e.g., VAHCS Policy Memoranda or MCPM), which will serve as the rules and regulations of the medical staff, must be recommended by the VAHCS's Medical Executive Council (MEC) and approved by the governing body (Director).   Neither the MEC nor the Director shall unilaterally modify these policies and procedures applicable to the medical staff.  These Bylaws and the rules and regulations of the medical staff and governing body bylaws (e.g. Handbooks, Directives, Manuals, and Circulars) must not conflict.  These Bylaws do not create any rights or liabilities not otherwise provided for in VHA regulations or Federal law and regulations.

There must be medical staff representation and participation in any VAHCS deliberations that affect the discharge of medical staff responsibilities.

The medical staff shall adhere to applicable Joint Commission standards in matters that are not specifically addressed in these Bylaws and the Center's policies and procedures applicable to them.

Members of the medical staff are encouraged to attend meetings of the medical staff and committees to which they have been assigned.    A member of the medical staff is obligated to attend any meeting with the Chief of Staff, Director, MEC, or other medical staff committee to which they are specifically invited.

The medical staff shall meet at least annually and at the call of the Chief of Staff.

Article I.        Medical Staff Structure

A.      The Chief of Staff serves as the Chair of the medical staff.  The appointment and removal process for this position is addressed in VHA Handbook 5005.  There are no other officers of the medical staff.

B.      Licensed independent practitioners with appropriate privileges manage and coordinate a patient's care, treatment, and services.

C.      A patient's general medical condition is managed and coordinated by a physician.

D.      The medical staff shall be organized into the following categories:

1.      Active Medical Staff:

(a)     Physicians, dentists, and other licensed independent practitioners (LIPs) who are doctoral level clinical practitioners (include but not limited to audiologists, optometrists, podiatrists, psychologists and speech pathologists) who are employed at least 4/8's time at the VAHCS.

(b)     Members of the active medical staff have voting rights and except for those with administrative responsibilities only, must have delineated clinical privileges.

(c)     Active Medical Staff are expected to actively participate in appropriate medical staff meetings and activities including committees of the medical staff.

(d)     Active Medical Staff are expected to actively participate in Healthcare System performance improvement activities to improve quality of care, treatment, services, and patient safety.

2.      Affiliate Medical Staff:

(a)     Includes the same professional disciplines as active medical staff but who are employed less than 4/8th's time at the VAHCS, contracted, and employed as WOC or Fee Basis.

(b)     Members of the affiliate medical staff do not have voting rights and except for those with administrative responsibilities only, must have delineated clinical privileges.

       (c)     Affiliate medical staff may attend staff meetings and may participate in medical staff activities.

3.     Associate Medical Staff:

       (a)     All other clinical practitioners at the VAHCS who are required by the Veterans Health Administration VETPRO program to be credentialed. This would include but not limited to advance practice nurses, physician assistants, and nurse anesthetists.

       (b)     Associate medical staff who are employed at least 4/8's time at the VAHCS have voting rights.

       (c)     Associate medical staff, except those with administrative responsibilities only, will have a scope of practice if not privileges.

       (d)     Associate medical staff with voting rights are expected to actively participate in appropriate medical staff meetings and activities.  Other associate medical staff may attend staff meetings and may participate in medical staff activities.

## Article II.      Criteria and Qualifications for Appointment to the Medical Staff

The criteria and qualifications for appointment to the medical staff are documented in regulations of the Veterans Health Administration and Federal law and regulations. Attachment A (Credentialing and Privileging) of these Bylaws provides amplifying guidance and process.

## Article III.      Clinical Service Chiefs

A.     Qualifications:  Certification by an appropriate specialty board or affirmatively established comparable competence through the credentialing process.

B.     Roles and Responsibilities:

1.     Clinically related activities of the department
2.     Administratively related activities of the department, unless otherwise provided by the VAHCS
3.     Continuing surveillance of the professional performance of all individuals in the department who have delineated clinical privileges or have appointments to the medical staff with a scope of practice
4.     Recommending to the medical staff the criteria for clinical privileges that are relevant to the care provided in the department
5.     Recommending clinical privileges for each member of the department
6.     Assessing and recommending to the relevant VAHCS authority off-site sources for needed patient care, treatment, and services not provided by the department or the organization
7.     The integration of the department or service into the primary functions of the organization

8.      The coordination and integration of interdepartmental and intradepartmental services
9.      The development and implementation of policies and procedures that guide and support the provision of care, treatment, and services
10.     The recommendations for a sufficient number of qualified and competent persons to provide care, treatment, and service
11.     The determination of the qualifications and competence of department or service personnel who are not licensed independent practitioners (LIPs) and who provide patient care, treatment, and services
12.     The continuous assessment and improvement of the quality of care, treatment, and services
13.     The maintenance of quality control, quality improvement, performance improvement, and utilization review programs, as appropriate
14.     The orientation and continuing education of all persons in the department or service
15.     Recommendations for space and other resources needed by the department or service

Article IV.      Medical Executive Council

A.      The medical executive committee of the medical staff of the Miami VAHCS shall be called the Medical Executive Council (MEC).  The MEC is chaired by the Chief of Staff.

B.      Membership:

1.      Voting members (11):

(a)     Chairperson:  Chief of Staff.
(b)     Associate Chief of Staff for Mental Health
(c)     Associate Chief of Staff for Performance Improvement and Education
(d)     Associate Chief of Staff for Extended Care
(e)     Associate Chief of Staff for Ambulatory Care
(f)     Chief of Medicine
(g)     Chief of Surgery
(h)     Three other members of the active medical staff one of whom shall be elected by the voting members of the medical staff with the approval of the Director and the remaining two shall be appointed by the Chief of Staff
(i)     One member of the full-time associate medical staff who shall be elected by the voting members of the medical staff with the approval of the Director

The process for electing two active medical staff members to the MEC is as follows:

> 1. The medical staff nominates both active and associate medical staff members via a paper or electronic ballot.
> 2. The nominated medical staff members will appear on an electronic voting ballot to be submitted to all medical staff.
> 3. Upon receipt of the electronic voting ballot, the medical staff is to select one active medical and one associate medical staff member.
> 4. The active and associate medical staff members with the majority of votes will be appointed to the MEC upon the approval of the Director.

The process for removal of a MEC member is as follows:

> 1. A complaint is filed with MEC or by MEC member or Medical Staff member (i.e. Attendance, Conduct, Adverse Actions against privileges, etc.)
> 2. A board of inquiry is appointed by COS consisting of 3 voting members of the MEC.
> 3. A hearing will occur and the board will offer a recommendation.
> 4. A recommendation requires 2/3 vote by MEC members for approval.

    2.      Non-voting members (2):
         (a)      Miami VA Healthcare System Director or designee
         (b)      Associate Director for Nursing Service or designee
         Term of office for the four non-permanent members of the MEC will be for two years and consecutive terms are allowed.

C.      Meetings:

    1.      The MEC shall set its own meeting schedule but shall also meet at the call of the Chairman.
    2.      No quorum is required but a majority vote of the voting members of the MEC is required to adopt a measure.
    3.      Any member of the medical staff has the right to bring issues to the MEC for consideration.

D.      Responsibilities and Function:

    1.      Represent and act on behalf of the medical staff
    2.      Report at each general medical staff meeting
    3.      Acts to ensure effective communication between the medical staff and the Director
    4.      Makes recommendations to the voting members of the medical staff for amendments to these Bylaws

5.      Makes recommendations directly to the Director for approval on at least the following matters:

    (a)      Structure of the medical staff including any committees or other activity groups

    (b)      Appointment and reappointment to the medical staff including reviewing, granting, reducing, revoking, suspending, denying, or terminating an appointment to the medical staff

    (c)      Delineation of clinical privileges for members of the medical staff including reviewing, granting, revoking, suspending, denying, or terminating clinical privileges

    (d)      Departmental-specific criteria for all clinical privileges in each medical department

    (e)      Organization of medical staff performance improvement (PI) activities, including the mechanism used to measure, assess, and improve such activities

    (f)      Participation of the medical staff in Joint Commission and other applicable survey activities

    (g)      Designated mechanisms for activities related to patient safety.

    (h)      Mechanisms for peer review and fair hearing procedures in accordance with Veterans Health Administration directives and Federal law. (Attachment B)

    (i)      Reviewing and acting on reports and recommendations from medical staff committees, departments, and PI or other related activity groups

    (j)      Adoption or revision of VAHCS policies and procedures that are specific to the medical staff

    (k)      Disseminating appropriate information from medical staff meetings including the MEC to clinical support staff, administration, and the governing body.  The medical staff may communicate with all levels of governance involved in policy decisions affecting patient care services within the Veterans Health Administration via appropriate channels

    (l)      Recommending space and other resources needed to support the Healthcare System's overall plan for the delivery of patient care

Article V.      Professional Standards Board

A professional standards board (PSB) will serve as a credentials committee whose roles and responsibilities are described in Attachment A, "Credentialing and Privileging".  All recommendations of the PSB will be forwarded to the MEC for review and recommendation prior to being sent to the Director for approval.

Article VI.      Clinical Service Chief Council

The Clinical Service Chief Council (CSCC) is composed of all the clinical service chiefs.

The CSCC is chaired by the Chief of Staff.  It shall meet at least quarterly and at the call of the Chief of Staff.  Its primary responsibility is to serve as a forum for the clinical service chiefs to discuss matters of particular concern and interest to them, especially matters pertaining to academic affiliations and graduate medical education, and for the dissemination of information pertinent to the clinical services.   A quorum to conduct business of the CSCC shall be at least a majority of the council's membership.   Adoption of a recommendation shall require a majority vote of those present.  Recommendations of the CSCC shall be submitted to the MEC and/or Director.

Article VII.     Credentialing, Privileging and Appointment

The Miami VAHCS is part of the Veterans Health Administration (VHA) and as such is subject to the regulations of VHA and applicable federal law and regulations.   VHA Handbook 1100.19 and supplemental directives provide the procedures and other necessary information regarding credentialing, privileging, and appointment that must be followed at this VAHCS.   See Attachment A of these Bylaws.

Article VIII.    Corrective Actions and Fair Hearing

Corrective actions and fair hearing procedures for the medical staff are described in Attachment B of these Bylaws.

Acceptance of membership on the medical staff shall constitute the member's assurance that they will abide by the principles of ethics promulgated by the Veterans Health Administration and the professional body that has certified them.  In case of a complaint about the professional, moral, or ethical behavior of any member of the medical staff, the Chief of Staff has the right and duty to investigate and advise the Director accordingly.

Article IX.      Amendments to the Bylaws

These Bylaws shall be revised by amendment when necessary to ensure that they reflect current practices with respect to medical staff organization and functions.   At a minimum, the Bylaws shall be reviewed at least every two years (from the Director's approval date) by the MEC.  Proposed amendments to the Bylaws of the medical staff may be submitted in writing to the Chief of Staff by any member of the medical staff.   Such proposals shall be reviewed by the MEC and a recommendation for amendment and adoption shall be forwarded to the medical staff as a whole for review and approval either electronically or at a Medical Staff meeting.  A majority of the voting members of the medical staff voting shall be required to recommend adoption of an amendment to the Bylaws.  The recommendation for amendment will then be forwarded to the Director for approval.  An amendment to the Bylaws will be effective when approved by the Director.   Neither the medical staff nor the Director may unilaterally change the Bylaws.

Article X.        Rules

The Medical Staff shall adopt rules (abstracts of critical Medical Center Policy Memoranda) as may be necessary to implement more specifically the general principles found within these Bylaws, subject to approval of the Healthcare System Director.  Such rules shall guide the performance of the duties of Medical Staff members and shall be a part of these Bylaws.

Policies identified in the Rules may be amended or repealed upon the recommendation of the Medical Executive Council.  Recommendation for adoption of new rules will be accomplished through Medical Staff review and approval either electronically or at a Medical Staff meeting.  A majority of the voting members of the medical staff voting shall be required to recommend adoption of new rules.  Such changes shall become effective when approved by the Healthcare System Director.  Neither the medical staff nor the Director may unilaterally change the rules.

Article XI.        Rescission

The adoption of these Bylaws together with the appended rules rescinds the formerly adopted Medical Staff Bylaws dated May 17, 2004.

Recommended for approval by the Medical Executive Council on January 24, 2007.

Recommended for approval by the Medical Staff on February 7, 2007.

_____/S/_____
John R. Vara, M.D.
Chief of Staff

APPROVED:

Date:  __3/1/07__                    _____/S/_____
Stephen M. Lucas
Director

**MIAMI VA HEALTHCARE SYSTEM MEDICAL STAFF BYLAWS**

**ATTACHMENT A. CREDENTIALING AND PRIVILEGING**

I.   PURPOSE

To establish guidelines within VHA Handbook 1100.19, JCAHO standards and Medical Staff Bylaws for the credentialing and privileging of physicians, dentists, optometrists, podiatrists, psychologists, audiologists, and associate medical staff members (nurse practitioner, physician assistant, certified registered nurse anesthetist, and clinical nurse specialist) who are permitted by the Medical Staff Bylaws and the governing authority of this medical facility to provide patient care at the Miami VA Healthcare System.

II.   POLICY

A.   Clinical privileges shall be granted to practitioners who are appointed or utilized on a Full-time (FT), Part-time (PT), Intermittent, Consultant & Fee Basis, Without Compensation (WOC), On-Station Sharing Agreement or Contract basis commensurate with their licensure, education, training, experience, competence, judgment, character, and ability to perform.  The determination to grant clinical privileges will be supported by primary-source verified documentation, references and other relevant information.  Medical and associate medical staff must have current hospital/service-specific clinical privileges or clinical scope of practice approved by the governing authority of this medical center before providing patient care.

B.   Privileges are maintained through the ongoing professional practice evaluation that identifies professional practice trends and its impact on quality of care and patient safety.  Privileges are not to exceed two years under any circumstances.

C.   This policy memorandum does not apply to residents except for those who function outside of their training program, i.e., as Chief Residents, Emergency Department fee basis physicians, Medical Officer on Duty, or Compensation and Pension examination fee basis physicians.

III.   DEFINITIONS

A.   Appointment – The process by which medical and associate medical staff are accepted and approved to practice in this facility.  Practitioners, by the nature of their position, who are not involved in patient care can be appointed as medical staff members through the credentialing process, but may not need to be privileged.

B.   Credentialing – The systematic process of collection, verification, and assessment of information regarding three critical parameters: 1) current licensure, 2) education and relevant training, 3) experience, ability and current competence to perform the requested privileges and to fulfill the requirements of the position.

ATTACHMENT A. CREDENTIALING AND PRIVILEGING

    C.    <u>Privileging</u> – The process by which a practitioner who is licensed for independent practice is permitted by law and by this facility to practice independently and provide medical or other patient care services, within the scope of individual's license, based on the individual's clinical competence as determined by peer references, professional experience, health status, education, training, licensure and registration.  This process applies to the associate medical staff for granting clinical scope of practice under collaboration or supervision.

    D.    <u>Reappraisal</u> – The process of evaluating the professional credentials, current licensure, clinical competence and ability to perform of individuals who hold clinical privileges and/or medical staff appointment within the Miami VA Healthcare System for reappointment.  Provider-specific provider profiling data should be obtained from the ongoing professional practice evaluation process to support the maintenance of privileges.

    E.    <u>Reduction/revocation</u> – Privileges shall be reduced or revoked in the event that a practitioner is found incompetent as result of the focused professional practice evaluation.  Information regarding reduction of privileges and revocation of privileges may be found in current Fair Hearing and Appeals process and VHA Handbook 1100.19.

  IV.  <u>RESPONSIBILITY</u>

    A.    <u>Director:</u>

        1.    Ensure that the Medical Center Credentialing and Privileging program is in full compliance with the Medical Staff Bylaws, VHA Handbook 1100.19, all applicable VHA Directives and JCAHO standards.

        2.    Is the final approving authority for initial/renewal of the medical staff appointment and clinical privileges for candidates who have been recommended by the Medical Executive Council (MEC).

    B.    <u>Medical Executive Council (MEC):</u>

        1.  Acting on the recommendation of the Professional Standards Board, the Council makes final recommendations on all request for medical staff appointment and clinical privileges for approval by the Director.

    C.    <u>Professional Standards Board (PSB):</u>

        1.  Acting as a subcommittee of the Medical Executive Council, this board assures all required documentation to support the requested clinical privileges has been furnished by applicants and verified through the credentialing process as approved by the MEC.

APPENDIX A.  CREDENTIALING AND PRIVILEGING

2. Evaluates applicant's credentials to ensure that the appropriate qualifications support the appointment and clinical privileges requested and makes recommendations to the Medical Executive Council.

3. Review an individual's qualifications for advancement or reappointment by an examination of the credentialing and privileging folder, clinical performance data, ongoing professional practice evaluation data through provider profiling system, the Official Personnel File (OPF), proficiency reports, supervisory evaluations and to make recommendations based on their findings.

4. Conduct probationary and disciplinary reviews for medical staff and associate medical staff members, as mandated or when necessary.

5. The Medical Staff Professional Standards Board structure includes Physician PSB, Dental PSB, Advance Practice Nurse (APN) PSB, and Physician Assistant (PA) PSB.  The Chief of Staff is the chair of the Professional Standards Board.  The Medical Staff Specialist acts as technical advisor to the Boards and coordinates board meetings and agenda items.  The Chief of Human Resources Management (or designee) acts as HR technical advisor to the Board and attends meetings, as requested.

- The Physician PSB membership will comply with VHA Handbook 5005, Part II, Section 2, that requires the Board be composed of three of the permanent physician members.  The Chief of Staff is the Chairperson and two members of the Medical Executive Council are appointed by the Chief of Staff.  Clinical Service Chiefs may serve as alternate members when a PSB member is not available or excused.  The Physician Professional Standards Board meets twice a month in conjunction with the MEC.  Additional board meetings may be called at the discretion of the Chairperson for issues that require the board's immediate attention.
- The Dental PSB is composed of the Chief of Dental and two of the permanent dentist members.  The Chief of Staff may delegate the Chief of Dental as the Chairperson of the Dental PSB.
- The APN (Advanced Practice Nurse) PSB reviews credentialing and clinical scope of practice actions on Advanced Registered Nurse Practitioners, Clinical Nurse Specialists, and Nurse Anesthetists.  The PA PSB reviews credentialing and clinical scope of practice actions on Physician Assistants.  In cases where an associate medical staff is being
- reviewed, an Advanced Practice Nurse member or a Physician Assistant member, as appointed by the Director, replaces one physician member of the PSB.

D.   <u>Chief of Staff:</u>

APPENDIX A.  CREDENTIALING AND PRIVILEGING

       1.       Establishes a mechanism to assure that all individuals with clinical privileges function within the scope of privileges granted.

       2.       The Chief of Staff, as Chairperson of the Professional Standards Board and the Medical Executive Council, reviews and recommends practitioners to the Director for approval to membership of the medical staff.

E.     <u>Medical Staff Specialist:</u>

Is responsible for the operational aspects of the Credentialing and Privileging program.  Assures all regulations and procedures are followed in the credentialing and privileging process.

F.     <u>Service Chiefs:</u>

       1.       Makes recommendations on the appointment of applicants to their services.

       2.       Conducts ongoing professional practice evaluation to assess the professional performance, judgment, clinical competence and skills of practitioners; recommends renewal, restriction or revocation of privileges as necessary.  The Service Chief maintains performance assessment and improvement data in a secure file, and evidence of these reviews is presented to the PSB when requested.

V.    <u>PROCESS</u>

A.     The Service Chief recommends an applicant for initial medical staff appointment in writing and request the applicant be interviewed by the Chief of Staff or a designee (Attachment A).  This interview will be coordinated between the Medical Staff Office and Chief of Staff's Office.  The Chief of Staff interview result is forwarded to the Medical Staff Specialist.

B.     The Medical Staff Specialist will forward a credentialing and privileging application package to the applicant.  An applicant submits a complete application packet (both in paper and electronically via VetPro) to the Medical Staff Office within 30 days.  If the Chief of Staff does not concur with the service chief recommendation of an applicant, the request will be returned to the service with reason(s) for rejection.

C.     The Medical Staff Specialist and Medical Staff Assistants are responsible for

processing the credentialing and privileging documentation upon the completion of application packet.  Primary source verification and other information will be handled in accordance with VHA Handbook 1100.19.

D.     The Medical Staff Specialist submits the C&P package to a designated member of

ATTACHMENT A. CREDENTIALING AND PRIVILEGING

the Professional Standards Board (PSB) and/or Medical Executive Council for review and recommendation.  A copy of the credentialing documents that are necessary to determine Title 38 employment will be provided to the Chief of Human Resource Management Service.

E.      The Medical Staff Specialist forwards the completed package to the Professional Standards Board for the review of the applicant's credentials.  The Service Chief who recommended the package or his/her designee presents the applicant's credentials to the PSB.

F.      Professional Standards Board recommendations are forwarded to the Medical Executive Council for final recommendations, and the MEC recommendation is forwarded to the Director for approval.  Either the Medical Executive Council or the Professional Standards Board may convene via electronic communication.  If MEC recommends disapproval on the PSB's recommendation, the issue will be addressed at the regularly scheduled PSB for further discussion.

G.      The Medical Staff Office personnel responsible for verifying that the practitioner requesting approval is the same practitioner identified in the credentialing documents by viewing of a current picture hospital ID card or a valid picture ID issued by a state or federal agency (e.g. drivers license or passport).  ID verification using I-9 Form (Employment Eligibility Verification) is acceptable.  When ID verification is conducted by another department as designated by the Director, a copy of documentation will be forwarded to the Medical Staff Office.

H.      The Medical Staff reprivileging process begins three months prior to the expiration of current privileges in accordance with VHA Handbook 1100.19.  Provider-specific clinical performance data is collected through the ongoing professional practice evaluation and analyzed to validate current competency.  Once the credentialing process is completed for reappointment, the request for reappointment will be processed through the boarding process.

I.      The Medical Staff Specialist notifies applicants of the decision to grant, limit, or deny an initially requested privileges or renewal request of privileges within seven days after the Director's approval.  In the event of privilege denial, the applicant is informed of the reason for denial.  The Medical Staff Specialist ensures the decision to grant, deny, revise, or revoke privileges is disseminated to all appropriate personnel including external persons or entities.  A copy of notification letter or email should be filed in the individual's credentialing folder.

VI.     EXCEPTIONS

        A.      Temporary Privileges:

14

ATTACHMENT A. CREDENTIALING AND PRIVILEGING

1.   In case of important and urgent patient care, treatment, and service need, temporary privileges may be granted by the Director based on the recommendation of the Chief of Staff in accordance with MP-5, Part II, Chapter 2 and VHA Handbook 1100.19.  The Director must validate the specific patient care situation that warrants temporary privileges. Temporary privileges are not to exceed 45 working days as preset by the temporary appointment process in VetPro.

2.   The following credentials must be verified prior to granting temporary privileges.

- One current and active state medical license
- A complete application (VA Form 2850-10)
- Relevant training or experience
- National Practitioner Data Bank query and evaluation
- Federation of State Medical Boards query
- Current competence (Confirmation of current privileges held at a JCAHO accredited facility that are equivalent to requested clinical privileges or clinical performance data with outcome for last two years)
- Ability to perform the privileges requested
- Confirmation of Declaration of Health
- One reference verification
- Request for temporary privileges with justification submitted by the Service Chief
- No current or previously successful challenge to licensure or registration
- No subjection to involuntary termination of medical staff membership at another organization
- No subjection to involuntary limitation, reduction, denial or loss of clinical privileges

B.   Expedited Appointment:

1.   The purpose is to assist in expediting the medical staff appointment process. This is a one-time appointment process for initial appointment or reappointment to the Medical Staff and may not exceed 30 workdays as preset by the expedited appointment process in VetPro.  This 30 workday period may not be extended or renewed.  Complete credentialing and appointment process must be accomplished within 30 workdays upon the approval of expedited appointment.  Otherwise the expedited medical staff appointment will automatically be terminated as prescribed in VHA Directive 2002-076.

2.   The subcommittee for Expedited Appointment consists of the Chief of Staff as a Chairperson and one voting member of the Professional Standards Board. The Committee shall meet as often as necessary as determined by the Chairperson.  The Medical Staff Specialist will forward the applicant's

14

credentialing package to the subcommittee for the review of the applicant's credentials. The subcommittee reviews and evaluates the qualifications and

3. competence of the practitioner applying for appointment, reappointment, or renewal or modification of clinical privileges and renders its decision. The subcommittee recommends granting privileges under the expedited appointment to the Director. All positive recommendations by the subcommittee will be ratified by the Professional Standards Board at its regularly scheduled meeting. If the subcommittee's decision is adverse to an applicant, the matter is referred to the Professional Standards Board.

4. An applicant requesting the expedited appointment must meet all of the following credentialing criteria.
   - Complete application packet including VA Form 10-2850 and VetPro
   - All license verified by the primary source
   - Primary source verification of education and training
   - Confirmation of Declaration of Health
   - Federation of State Medical Boards Query (Initial appointment only)
   - National Practitioner Data Bank Query
   - Current equivalent privileges held at another institution
   - Two peer references
   - At least one verification of current or most recent professional experience

5. An applicant is ineligible for the expedited process due to the following items and may not be employed in any position under Title 38 U.S.C., Section 7402(b) per VHA Directive 2002-076.

   - Incomplete application.
   - A final recommendation by the MEC that is adverse or has limitations.
   - Current or previously successful challenge to licensure or registration.
   - Involuntary termination of medical staff membership at another institution.
   - History of involuntary limitation, reduction, denial, or loss of clinical privileges.
   - Evidence of an unusual pattern of, or an excessive number of, professional liability actions resulting in a final judgment against the applicant.

6. The expedited appointment to the medical staff process does not relieve an applicant, the Service Chiefs, and the Medical Center from any human resources appointment requirement.

C. <u>Disaster Privileges:</u>  See Medical Center Policy Memorandum 11-53.


VII. <u>CORRECTIVE ACTIONS AND FAIR HEARING</u>

ATTACHMENT A. CREDENTIALING AND PRIVILEGING

Corrective actions and fair hearing procedures for the medical staff are described in the current medical center policy on fair hearing and appeals process and VHA Handbook 5021,
Employee/Management Relations, Appendix A. Disciplinary and Grievance Procedures.

VIII.   REFERENCES:

Joint Commission on the Accreditation of Healthcare Organizations Manual
VHA Handbook 1100.19, Credentialing and Privileging
VHA Directive 2001-022, Implementation of VetPro
VHA Directive 2003-014, VHA Requirement to Query the Federation of State Medical Boards
VHA Handbook 5005, Part II, VHA Supplement Chapter 2; M-2, Part I, Chapter 34
Directive 10-95-088, OMB Circular A-123 Management Accountability and Control (RCS 04-0405), including Change 1, dated September 22, 1995;
Circular 10-89-124, Dental, Optometry and Podiatry Resident/Trainee Credentialing, dated December 4, 1990
VHA Directive 10-95-032, Delegation of Title 38 Human Resources Management Authorities, dated March 23, 1995
VHA Handbook 5021, Employee/Management Relations

VIII.   RESCISSION

Medical Center Policy Memorandum 11-02-04.

IX.   FOLLOW-UP RESPONSIBILITY

Chief of Staff (11)

Attachments:
Appendix A. Initial Appointment Process
Appendix B. Reappointment Appointment Process
Appendix C. New Medical Staff Member Appointment Request
Appendix D. New Medical Staff Member and HR Appointment Process

APPENDIX A. Initial Appointment Process



APPENDIX B. Reappointment Process



New Medical Staff Member Appointment Request

The following information is necessary to request a new provider:

Social Security Number:                Birth Date (mm/dd/year):
**NPI Number:**
Full Name:                                    Degree:

Birth City/State:                            Birth Country:

Mailing Address (street address required; do not list P.O. Box address)

HP#:                              WP#:
FAX#:                            BEEPER#:                      CELL#:

**CITIZENSHIP:**          **US Citizen by Birth (   )**
                                        Naturalized Citizen        (   )
Not a US Citizen (   ), please indicate Visa Status; i.e., Permanent Resident, etc.

**LICENSURE (State/License#):**

SERVICE:                      PROPOSED EOD:

TYPE OF APPOINTMENT: (Circle as appropriate.)

**FT          PT (    /8TH)          CONTRACT      FEE BASIS/CONSULTANT      WOC**

**RECRUITMENT VICE**

SIGNATURE OF SERVICE CHIEF                                DATE

(Please attach a copy of CV and allow 6-8 weeks of processing time after CoS interview.  Any further questions can be addressed to Medical Staff Office, at 305.575.3176 or Ext. 6388/6387/6386.  **Do not write below the dotted line.**  Thank you.
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

**Current & unrestricted license: Y  /  N**
**OIG Sanction Search:    Negative  /  Positive**
**Board Cert:          Y  /  N**

**After interviewing the above applicant, I concur with the Service Chief recommendation.**

JOHN R. VARA, MD, COS                                    DATE

19

# *New Medical Staff Appointment Process*



*All official salary/job offers should be communicated solely by Human Resources to the candidate once the Compensation Panel Action is approved by the Director.*

**All communication regarding the Medical Staff credentialing & privileging process should be directed to the Medical Staff Office.*

MIAMI VA HEALTHCARE SYSTEM MEDICAL STAFF BYLAWS

ATTACHMENT B.  FAIR HEARING AND APPEALS PROCESS FOR MEDICAL STAFF

I.      PURPOSE

To establish a fair hearing and appeals process for addressing adverse decisions regarding reappointment, denial, reduction, suspension, or revocation of privileges that may relate to quality of care, treatment and services issues.  The fair hearing and appeals process assures full consideration and reconsideration of quality and safety issues and, under the current VHA Directive, 1100.17 (NPDB Reporting), allow licensed independent practitioners an opportunity to defend themselves.

II.     POLICY

1.  The fair hearing and appeals process applies to licensed independent practitioners and allied health professionals who are privileged and appointed as medical staff members per credentialing and privileging process (Attachment A. of Bylaws), VHA Handbook 1100.19 and are employed under authority of Title 38, United States Code, Section  7401 (1).

2.  The fair hearing and appeals process allows the affected individual a fair opportunity to defend herself or himself regarding the adverse decision to the Medical Executive Council (an unbiased hearing body of the medical staff), and an opportunity to appeal the decision of the Medical Executive Council to the Director (the governing body).

3.  The fair hearing and appeals process and/or any activities resulting in adverse actions against privileges must be separate from the reappraisal and reprivileging process.  Any potential deficiencies identified from the facility performance improvement program protected under 38 U.S.C. 5705 may not be used as basis for adverse actions and must be rediscovered through the independent process, such as administrative review or board of investigation.

4.  Any professional review action that adversely affects the clinical privileges of a practitioner for a period longer than 30 days, including the surrender of clinical privileges or any voluntary restriction of such privileges, while the practitioner is under investigation, is reportable to the NPDB pursuant to the provisions of the VHA policy regarding NPDB reporting.

III.    DEFINITIONS:

1.  Reappointment:  Reappraisal process as defined in the credentialing and privileging process.

ATTACHMENT B.  FAIR HEARING AND APPEALS PROCESS FOR MEDICAL STAFF

2.  Denial:  Privileges may de denied when an individual does not meet the privileging qualification as defined in the core privileging criteria (MCPM 11-02-07) and VHA Handbook 1100.19.

3.  Revocation:  Refers to the permanent loss of clinical privileges.

4.  Suspension:  Refers to the temporary loss of full or partial clinical privileges pending a final outcome after comprehensive review and due process.

5.  Reduction:  Reduction of privileges may include, but are not limited to, restricting or prohibiting performance of selected specific procedures or prescribing controlled substances.  Reduction of privileges may be time limited and restoration of privileges may be contingent upon evidence of ability to perform current competencies, as determined by demonstration of recovery from a medically disabling condition, direct observation and/or successful completion of a proctorship.

IV.   RESPONSIBILITY:

1.  The Director has the ultimate responsibility for implementing this policy.

2.  The Chief of Staff has the responsibility for ensuring the members of the medical staff are compliant with this policy and VHA guidelines.

3.  Clinical Service Chiefs are responsible for ensuring that the members of the medical staff are educated and compliant with the policy in order to protect patient safety and the quality of care.

4.  All members of the Medical Staff are responsible for acknowledgement and compliance of this policy.

V.   PROCEDURES:

1.  Reduction or Revocation of Privileges

a.  A substandard quality of care issue and/or performance improvement data may trigger the preliminary review process of a practitioner.  The Service Chief, a Medical Staff member, or the Chief of Quality Management will immediately alert the Chief of Staff of the issue.

b.  The Chief of Staff may suspend the practitioner's privileges for 30 days to ensure quality of care and safety of patients.  The COS may convene a special Professional Standards Board comprised of two senior medical staff members, Regional Counsel, Service Chief, and the Chief of QM.  The COS will appoint an Acting Service Chief in the event that the Service Chief is being subject to the review process.

ATTACHMENT B.  FAIR HEARING AND APPEALS PROCESS FOR MEDICAL STAFF

c. The practitioner will receive written notice of intent of the proposed changes in privileges from the Chief of Staff.  The notice will include: (1) A discussion of the reason(s) for the change (2) A statement that, upon the outcome of the proceedings, a report may be filed with the National Practitioner Data Bank (NPDB), with the appropriate State Licensure Board (SLB) in all states in which the practitioner holds a license and in the State in which the facility is located.  (3) A statement of the practitioner's right to be represented by an attorney or other representative of the practitioner's choice throughout the proceedings.

d. The practitioner will be allowed to review all evidence not restricted by regulation or statute upon which proposed changes are based.  Following that review, the practitioner may respond in writing to the Chief of Staff's written notice of intent.  The practitioner must submit a response within ten (10) workdays of the COS's written notice.  If requested by the practitioner, the Chief of Staff may grant an extension for a brief period, normally not to exceed ten (10) workdays, except in extraordinary circumstances.

e. Information from the special PSB's findings and recommendation will be forwarded to the Medical Executive Council for a final recommendation. The MEC recommendation and all subsequent information will be forwarded to the Medical Center Director for a decision.  The Director will make a decision on the basis of the record.  If the practitioner disagrees with the Director's decision, a hearing may be requested.  The practitioner must submit a request for a hearing within five (5) workdays after receipt of the decision.

f. If a hearing is requested, the Medical Center Director will appoint a review panel of three professionals, within five (5) workdays to conduct a review and hearing.  At least two members of the panel will be members of the same profession as the practitioner.  This review panel hearing will be the only hearing process conducted in connection with the reduction of privileges; any other review processes will be conducted on the basis of the record.

g. During such hearing the practitioner has the right to be present throughout evidentiary proceedings, to be represented by counsel or other representative of practitioner's choice and to cross-examine witnesses.

h. The panel will complete its review and submit its report within fifteen (15) workdays. Additional time may be allowed by the Director for extraordinary circumstances or cause.  The panel's report, including findings and recommendations, will be forwarded to the Director who has authority to accept, reject, accept in part or modify the review panel's recommendation.

ATTACHMENT B.  FAIR HEARING AND APPEALS PROCESS FOR MEDICAL STAFF

    i.   The Director will issue a written decision within ten (10) workdays of the date of receipt of the panel's report. If the practitioner's privileges are reduced or revoked, the written decision will indicate the reason(s) for reduction.  The Director will determine whether the reduction or revocation of privileges warrants disciplinary action or not.  The signature of the Director constitutes a final action and the reduction or revocation is reportable to the NPDB.

    j.   The practitioner may submit a written appeal to the appropriate VISN Director within five (5) workdays of receipt of the Miami VA Healthcare System Director's decision.  This appeal option will not delay the submission of the NPDB report.

    k.   The VISN Director will provide a written decision based on the record within twenty (20) workdays after receipt of the practitioner's appeal.  The decision of the VISN Director is final and is not subject to further appeal.

2.   Dismissal of a Practitioner Due to Revocation of Privileges

    a.   When revocation of privileges is proposed and combined with a proposed demotion or dismissal, the due process rights of the practitioner will be accommodated by the hearing provided under the dismissal process.

         i.   When revocation of privileges is proposed for permanent employees appointed under 38 U.S.C. 7401(1), the revocation will be combined with proposed action to discharge the employee under 38 U.S.C., Part V, Chapter 74, Subchapter V.

        ii.   For probationary employees appointed under 38 U.S.C. 7401(1), the proposed revocation will be combined with probationary separation procedures contained in VHA Handbook 5005, Part II, Chapter 4, and its VHA Supplement.

      iii.   For employees appointed under 38 U.S.C. 7405, the proposed revocation will be combined with actions to separate the employee under the provisions of VHA Handbook 5021/4 and its VHA Supplement.

      iv.   When the revocation of privileges is proposed for employees not covered under subparagraph (i), (ii), and (iii) consideration must be given to discharging or removing the employee, as applicable.  The Director may consider other alternatives, such as demotion or reassignment to a position that does not require privileges.

    b.   Dismissal constitutes a revocation of privileges, whether or not there was a separate and distinct privileging action, and will be reported without further

ATTACHMENT B.  FAIR HEARING AND APPEALS PROCESS FOR MEDICAL STAFF

review or due process to the NPDB.

    c.   When revocation of privileges is proposed and not combined with a proposed demotion or dismissal, the due process procedures under reduction of privileges will pertain.

    4.   Nothing in these procedures restricts the authority of management to detail or reassign temporarily any practitioner to non-patient care areas or activities, thus in effect suspending privileges, during any proposed reduction of privileges or discharge proceedings.

    5.   The Director, on the recommendation of the Chief of Staff, may summarily suspend privileges, on a temporary basis, when there is sufficient concern regarding patient safety or specific practice patterns.

    6.   Summary suspension pending comprehensive review and due process is not reportable to the NPDB per VHA Handbook 1100.19, Para 6.g.(d).  The notice of summary suspension to the practitioner should include a notice that if a final action is taken, it will be reported to the NPDB.  The notice of summary suspension should also contain notice to the individual of all due process rights as outlined in this policy.

    VI.   <u>OTHER</u>:  None.

    VII.   <u>REFERENCES:</u>

VHA Handbook 1100.19, Credentialing and Privileging
VHA Directive 5005, Human Resource Management - Staffing
VHA Handbook 1100.17, NPDB Reports
VHA Handbook 1100.18, Reporting to State Licensing Boards
VHA Handbook 5021/4, Employee Management Relations

**ATTACHMENT C.  RULES OF THE MEDICAL STAFF**
**Miami Veterans Affairs Health Care System**

**Table of Contents**

**Conduct of Care**                                                                              **Page**
Advance Directives ............................................................................................... 2
DNR Orders.......................................................................................................... 2
Informed Consent ................................................................................................ 2
Emergency Services ............................................................................................. 3
Admissions ........................................................................................................... 3
Transfers .............................................................................................................. 4
Consultations ....................................................................................................... 4
Adverse Events..................................................................................................... 4
Organ and Tissue Donation .................................................................................. 4
Blood Transfusions............................................................................................... 4
Anesthesia Care ................................................................................................... 5
Autopsy ............................................................................................................... 5
Physician Orders.................................................................................................. 6
Automatic Stop Orders ........................................................................................ 6
Verbal Orders ...................................................................................................... 6
Restraint .............................................................................................................. 6

**Graduate Education Programs**
Resident Progressive Roles and Responsibilities ................................................. 7
Monitoring and Reporting of Resident Supervision ............................................. 8
Joint Affiliation Partnership Council reports to the Medical Executive Council ........... 9

**Role of Attending Staff in Medical Education**
Supervising Practitioner Duties ........................................................................... 9
New Admissions ................................................................................................... 9
Continuing Care Expectations .............................................................................. 9
            Outpatient Clinic ................................................................................... 9
            Consultation .......................................................................................... 9
            Acute Inpatient ..................................................................................... 10
            Operative/Invasive Procedures ............................................................ 10
Emergency Situations ......................................................................................... 10
Collaborative Practice—Associate Medical Staff ............................................... 10

**Medical Records**
Inpatient Documentation ................................................................................... 11
            History and Physical Examination ......................................................... 11
            Documentation Frequency ................................................................... 11
            Operative and Invasive Procedures ..................................................... 11
            Discharge Summaries............................................................................ 12
            Delinquent Medical Records ................................................................ 12
Outpatient Documentation ................................................................................ 12
**Patient Safety Goals**
            Universal Protocol…………………………………………………………………………………13
            Medication Reconciliation…………………………………………………………………………13
            Hand-off Communication…………………………………….…..…………………………………14
            Critical Test and Critical Values...........................................................14

**RULES OF THE MEDICAL STAFF**
**Miami Veterans Affairs Health Care System**
**MIAMI, FLORIDA**

The Rules relate to the role and / or responsibility of members of the Medical Staff and individuals with clinical privileges in the care of inpatients, emergency care patients and ambulatory care patients as a whole or to specific groups as designated.  Rules and policies of Services shall not conflict with the Bylaws, Rules, and policies of the Medical Staff or the requirements of the Governing Body.

<u>Advance Health Care Planning Including Withholding or Withdrawing of Life Sustaining Procedures</u> (**refer to current version of MCPM 122-10-XX for full direction**)

Each physician is responsible for collaborating with the patients/families regarding advance healthcare planning and to respect patient treatment preferences.  When life-sustaining treatment is medically futile, it will not be presented to the patient as a treatment option. Should the patient become unable to make decisions, the Attending Physician will implement the advance directives, including withholding or withdrawal of life-sustaining treatments.

<u>Do Not Resuscitate (DNR) Orders</u>  (**refer to current version of MCPM 11QA-03-XX for full direction**)

A DNR may be ordered by the attending physician after discussion with the patient/surrogate for patients who reach a point where the application of cardiopulmonary resuscitation (CPR) would be contrary to the patient's wishes and interests and would, therefore, be medically unsound.

If the Attending Physician is not in the Medical Center, residents may write a DNR order for patients with decision-making capacity or for patients with a surrogate decision maker using the following safeguards.  Prior to writing the DNR order:  (1) The resident must obtain consent from the patient or their authorized surrogate; (2) The resident must contact the Attending Physician to discuss the proposed DNR order.  In a telephone discussion, facilitated by the Administrative Officer on Duty (AOD), the resident will obtain the concurrence for the DNR order from the Attending Physician.  Following the discussion and after obtaining the concurrence of the attending physician, a progress note regarding the discussion (utilizing the appropriate template) and the DNR order will be entered into the electronic medical record (CPRS); (3) The Attending Physician will cosign the addendum to the DNR discussion and re-enter a DNR order at the earliest reasonable opportunity, and in all cases within 24-hours.  The DNR order is considered to be in effect when the order is written by the resident.

The appropriateness of the DNR order will be evaluated when the patient is transferred to a different level of care or whenever there is a change in the condition of the patient.  If the DNR remains appropriate, the attending physician receiving the patient will re-order the DNR.

<u>Informed Consent</u>  (**refer to current version of MCPM 136-78-XX for full direction**)

Patients have the right to accept or refuse any medical treatment or procedure recommended to them.  Except as otherwise provided by policy, all treatments and procedures require the prior, voluntary informed consent of the patient, or if the patient lacks decision-making capacity, the patient's authorized surrogate.

The scope of informed consent may be limited to a one-time, single treatment or procedure, or may encompass consent for routine care of a particular problem or condition (such as asthma) or for a series of treatments (such as dialysis).  Two circumstances where the informed consent discussion must be repeated and a new consent must be obtained:

a.      There is a significant deviation from the treatment plan to which the patient originally consented.
b.      There is a change in the patient's condition or diagnosis that should reasonably be expected to alter the original informed consent.

There are three main forms: (1) <u>Request for Administration of Anesthesia and for Performance of Operations and Other Procedures</u> (OF 522), (2) <u>Documentation of Informed Consent Discussion</u> (VAF 10-177 {546}) and (3) <u>Informed Consent for Transfusion of Blood and /or Blood Products</u> (VAF 10-2008 {546}).

<u>Signatures are obtained from patients with decision-making capacity</u>.  If the patient does not have decision-making capacity, an appropriate surrogate must give consent.  If an appropriate surrogate is not available consent is obtained from the Chief of Staff.

The practitioner who will be performing the procedure/treatment is responsible for fully informing the patient or surrogate of risks, benefits or alternatives of the proposed procedure and for obtaining the signature informed consent.

**Emergency Services**

This Medical Center's emergency services are designated at level III using Joint Commission definitions of Levels I, II, III or IV, and an accredited Chest Pain Center by the Society of Chest Pain Centers. Emergency Services are available 24-hours per day, 7-days per week.  The physician staffing level and qualifications are consistent with the level of services provided.  Specialty consultations are available through the on-call system; rosters are available in the emergency room.

This Medical Center will provide reasonable care in determining whether an emergency exists, will render lifesaving care, admit patients to inpatient status or make the appropriate referral to the nearest medical facility capable of providing the needed services.

Patients presenting with life-threatening conditions will receive the highest priority and will be evaluated and treated immediately.  Patients with non-emergent conditions will be evaluated and treated as soon as possible after arrival.

Emergency care will be provided to all eligible veterans and those individuals requiring emergency care on a humanitarian basis i.e. acutely ill or injured employees, visitors or volunteers.

**Admissions**   **(refer to current version of MCPM 136-46-XX for full direction)**

Individuals granted admitting privileges are physician members of the Medical Staff.

The referring provider requesting admission of a patient is responsible to: (a) assess the patient's need for observation, acute or long-term care; (b) contact the Utilization Review (UR) Nurse for criteria evaluation and admission number; (c) contact the emergency room physician for an admitting team assignment; (d) contact the receiving physician for case discussion and (e) supply bed control (Admissions) with the admission orders and admission authorization number.

Attending physicians are responsible for accepting assigned patients and for overall management of the patient throughout the hospital stay for timely and effective patient care orders, history and physicals, assessments, reassessment, consults, discharge planning, and for completion of documentation pertinent to patient care and discharge needs.

 Areas of restricted admission:

a.      Intensive Care Units:  **(refer to current version of MCPM 111-13-XX for full direction on admission to MICU and CCU)**
b.      Nursing Home Care Unit:  **(refer to current version of MCPM 136-25-XX for full direction)**
c.      Acute Care Psychiatric Unit:  **(refer to current version of MCPM 116-09-XX for full direction)**
d.      Acute Care Psychiatric Unit:  **(refer to current version of MCPM 116-08-XX for full direction)**
d.      Telemetry Unit  **(refer to MCPM 111-08-XX for full direction)**

**Transfers**  **(refer to current version 11-96-XX for full direction)**

Transfers to, from or within the Miami VAHCS shall be carried out appropriately and under circumstances that ensure safety for the patients and comply with applicable standards and laws.   The decision to transfer a patient will be based on the level of care needed and the stability of the patient for transfer.   Patients will not be transferred to or from the Miami VAHCS until there has been a physician-to-physician contact and the receiving attending has accepted the patient.  The transfer nurse will coordinate the transfer to the Miami VAHCS or from the Miami VAHCS.

**Consultations** (**refer to current version of MCPM 11-29-XX for full direction)**

Criteria for consult: (1) the provider does not have clinical privileges to perform a procedure or evaluation; (2) the patient's diagnosis is unclear; or (3) there is doubt as to the best therapeutic or diagnostic measure to be utilized.

A consult is placed as an order in CPRS by the provider.  The requestor should clearly indicate the urgency and the time frame within which the consult is to be performed.  The requestor is responsible to notify the consulted service by telephone of requests for urgent or emergent consults.

Consult replies will be entered in CPRS utilizing the appropriate consult note title.  A satisfactory consultation includes a review of all pertinent data relating to the patient or ordering additional studies sufficient to render an opinion on the care, a review of the patient's previous medical records, and a written opinion.

It is the responsibility of the requestor of the consult to review the recommendations of the consultant and place orders as clinically indicated.

Cancellation of a consult is justified when there is a duplicate request, patient refusal, no-show of appointment, diagnostic or therapeutic recommendations are provided to the requestor without the patient needing to be seen by the consultant, or when the consulting service needs additional information before seeing the patient.

All referrals to non-VA consultants will be approved by the Chief of Staff or authorized designee prior to referral.

**Adverse Events (refer to current version of MCPM 00-110-XX for full direction)**

The patient and/or the patient's family, as appropriate, must be informed in a timely manner (as soon as known) of unanticipated outcomes such as adverse events or sentinel events. The notification will include information about pertinent clinical facts associated with any injuries and the options available to them.  The attending physician will be responsible for initial communication with the patient and/or family as appropriate and for documentation of the discussion in the Medical Record.

**Organ/Tissue/Eye Donation (refer to current version of MCPM 122-08-XX for full direction)**
The designated organ, tissue, and eye donation requestor are is Life Alliance. Physicians are responsible for identifying patients who are at risk for impending death are admitted to the Intensive Care Units and who may meet the criteria for organ donation.  Physicians will notify the decedent affairs clerk or the administrator on duty who will contact the Designated Requestor to discuss potential donation.   Physicians may be asked to initiate the discussion regarding organ donation with family members.

**Blood Transfusions (refer to current version of MCPM 113-01-XX for full direction)**

Informed consent (written consent) for administration of blood and blood products will be obtained from the patient by the physician.  The signed consent is valid for a period of 30 calendar days.
A cross-match is valid for 48 hours. Specimen tubes must be labeled prior to drawing the blood by the person drawing the blood.  The labeling will include the patient's first name, last name, social security number, date, and the time drawn, including the signature in ink of the authorized person performing the venipuncture.

The physician ordering the transfusion has the ultimate responsibility for the transfusion process, including recognition and treatment of any complications incurred during or after the transfusion.   The ordering physician will complete and sign a SF-518, Blood or Blood Component Transfusion, in duplicate, for each unit of blood or blood component ordered, and complete one (1) VAF 10-363 (546) R Transfusion Audit Worksheet per order.

Only one unit of blood per patient will be released by the Blood Bank at one time with the exception of blood released to the operating room and blood released to the ward in the case of severely hemorrhaging patients.

**Anesthesia Care**   **(refer to current version of MCPM 139-03-XX for full direction)**

The standards for sedation and anesthesia care apply when patients receive, in any setting, for any purpose, by any route, moderate or deep sedation as well as general, spinal, or other major regional anesthesia.

All procedures requiring sedation and anesthesia care will be performed by staff members who have appropriate training, credentials and privileges, or by house staff under the supervision of attending staff with appropriate credentials.  Only individuals with specific privileges through the anesthesia service will be permitted to give deep sedation/analgesia.

All qualified individuals providing sedation and anesthesia care will have appropriate training in professional standards and techniques.  The Attending Provider for each procedure will have current Advanced Cardiac Life Support (ACLS) certification and will have completed a VA moderate sedation class within the past 2 years. Sedation and anesthesia care training will include:  (1) administering pharmacologic agents to predictably achieve desired levels of sedation; (2) airway assessment and management; and (3) Monitoring of patients in order to maintain the desired level of sedation.

Individuals providing moderate or deep sedation will have competency-based education, training, experience and will be appropriately credentialed in: (1 ) Evaluating patients prior to performing moderate or deep sedation or anesthesia; and (2)  Methods and techniques required to rescue patients who unavoidably unintentionally slip into a deeper-than-desired level of sedation or analgesia, i.e., management of a compromised airway, inadequate oxygenation and ventilation or compromised cardiovascular system.

Specific locations designated for the provision of sedation and anesthesia care at the Miami VA Healthcare System include the following and are limited to:

> Operating Room/Post Anesthesia Recovery (PAR) area - Minimal sedation (anxiolysis), Moderate sedation/analgesia, Deep sedation/analgesia and Anesthesia may be given.

> The following locations may only give minimal sedation (anxiolysis) or moderate sedation (conscious sedation): Bronchoscopy area; Cardiac Catheterization Laboratory; Critical Care Units (MICU, CCU, SICU); Dental Clinic;  Emergency Room; GI station; and Radiology-CT Scan / MRI / Special Procedures and the Oakland Park Clinic GI suite; unless the sedation and anesthesia care is being provided by an individual with specific privileges through the anesthesia service.

Anesthesia services can be provided within approximately 30 minutes for patients requiring emergency operative service where anesthesia is deemed necessary.

**Autopsy**

The treating physician (or physician who pronounced death) has primary responsibility for notification of the legal next of kin concerning the death of a hospitalized patients.

Deaths under certain circumstances must be reported to the Medical Examiner (ME).  The treating physician (or physician who pronounced death) must contact the Administrator on Duty to refer the following cases for ME review:  (1) homicide, (2) suicide,  (3) motor vehicle accident,  (4) trauma including falls resulting in a fracture

in or outside of the hospital, (5) burns, (6) deaths occurring suddenly in a person who was thought to be in good health, (7) occupation related deaths, (8) suspicion of abuse, (9) emergency room deaths and dead-on-arrival if a reasonable diagnosis cannot be established, (10) therapeutic misadventure, and (11) deaths in the operating room and under anesthesia.

If the death if not considered a ME case, the treating physician (or physician who pronounced death) will request permission, from the legal next of kin, for a complete or partial autopsy.  Authorization for autopsy must be obtained within 48 hours of the patient's expiration.

A report of gross and microscopic findings of the autopsy will be available in the medical record in 30 days.

**Physician Orders**

Orders shall be entered into the electronic medical record by physicians, residents and other clinicians operating within their clinical privileges or scope of practice.  Medical students cannot write orders.
As approved by the Medical Executive Council, registered nurses, pharmacists or dietitians may implement protocols as specifically stated in each protocol.

Chemotherapy orders:  The ordering of chemotherapy is generally limited to Oncology and Hematology.  However, providers in Dermatology, Arthritis, Special Immunology and Pulmonary can order specific agents as indicated by policy.

**Automatic Stop Orders (refer to current version of MCPM 119-11-XX for full direction)**

All medication orders, including alcohol, will be reviewed as to continuing need and re-ordered every fourteen (14) days, if appropriate, for acute care patients and every twenty-eight (28) days for Extended Care, Psychiatry, Spinal Cord Injury, and Rehabilitation Medicine patients.  (Exceptions are listed in the above policy).

**Verbal Orders  (refer to current version of MCPM 11-15-XX for full direction)**

Verbal or telephone orders are not encouraged but may be accepted in urgent/emergent situations where not accepting the order would compromise patient care.

A registered nurse, pharmacist or a respiratory therapist may accept verbal/telephone orders from an authorized prescriber. Respiratory therapists may accept verbal orders only for the adjustment of ventilator settings.

The recipient of a verbal/telephone order will, after listening carefully to the order, write down the verbal order, read back the order and receive confirmation from the individual who gave the order that the order was correct, and enter the complete order into CPRS.

The prescriber must authenticate the verbal order by electronic signature as soon as possible but no later that the by the time designated for completion of the medical record.

**Restraint**

**Restraint During Medical-Surgical Care: (refer to current version of MCPM 11-82-XX for full direction)**

Second year (or higher) resident physicians are authorized to order restraints.

If the physician is not available to write the individual restraint or protocol order restraint use can be initiated by a registered nurse based on appropriate assessment of the patient. Qualified house staff (physician) is notified within 12 hours of the initiation of restraint.

If the initiation of restraints is based on a change in the patient's condition, the registered nurse must notify the provider immediately (within one hour of initiation).

Qualified resident (physician) must assess the patient within 24 hours of initiation, verify and sign the orders.

**Individual Medical Orders:  Must be renewed every twenty- four hours**. The order will include the time and date and will be written on a specific restraint order form or CPRS template.

**Protocol Orders:  Do not need renewal.**  There are two medical staff approved protocols:  Protocol to Protect Medically Necessary Devices (invasive line / tube or catheter) and Protocol For Patients With Acute Medical Surgical Conditions (DT's, Acquired or Traumatic Brain Injury, Organic Brain Disease, Insulin Shock etc**.**

**Restraint for Behavioral Health Reasons: (refer to current version of MCPM 11-85-XX for full direction)**

Behavioral restraints are most commonly used on Acute Psychiatry (4AB) but may be initiated in other areas of the Miami VAHCS such as the Emergency Department for patients who meet the behavioral restraint criteria.

The written (CPRS) physician order for restraints will include: the time and date; patient behaviors warranting use of Behavioral Health Restraint clinical justification; a specified time limit (no more than 4 hours); the type of Restraint device to be used; and authorization for the registered nurse to release a patient prior to the expiration of the medical order whenever his/her assessment indicates that the patient has met the identified safe level of behavioral control.

All orders are time limited to four (**4**) hours.  The original time of the order starts at the time the patient is placed in restraints, not at the time the physician writes the order.

Any renewal of orders for Behavioral Restraint requires a face-to-face reassessment of the patient by the physician every eight (**8**) hours.  The new order must be time-limited not to exceed four  (**4**) hours.

A registered nurse deemed competent in the use of restraints can institute emergency physical restraint or seclusion use in response to a patient who poses an immediate danger to him or herself or to others.  The nurse performs and documents the face-to-face assessment in the progress notes when the procedure is carried out.  Emergency implementation may never exceed one hour.  A licensed physician (attending physician or PGY 2 or greater) must assess the patients within 1 hour, and determine if restraints are to be continued.

GRADUATE EDUCATION PROGRAMS

**Resident Progressive Roles and Responsibility:**

As part of their training program, residents should be given progressive responsibility for the care of the patient. The determination of a resident's ability to provide care to patients without a supervising practitioner present, or to act in a teaching capacity is based on documented evaluation of the resident's clinical experience, judgment, knowledge, and technical skill.  Ultimately, it is the decision of the supervising practitioner as to which activities the resident will be allowed to perform within the context of the assigned levels of responsibility.  The overriding consideration must be the safe and effective care of the patient that is the personal responsibility of the supervising practitioner.

The residency program director defines the levels of responsibilities for each year of training by preparing a description of the types of clinical activities residents may perform.  The documentation of the assignment of graduated levels of responsibility is made available to other staff as appropriate.  Annually, at the time of promotion, or more frequently as appropriate, this document, along with a list of residents assigned to each year or level of training, will be provided to the relevant VA residency program coordinator, service chief, and chief of staff.  The residency program director must include a specific statement identifying the evidence on which such an assignment is made and any exceptions for individual residents, as applicable.

PGY1:  The first year consists of rotations within the specialty focus so as to provide a broad foundation.  The PGY1 takes an active part in patient evaluation and management.  The PGY1 is an integral caregiver with the reassurance of constant support and supervision. Performs initial assessment of patients, makes diagnostic and

treatment decisions in collaboration with supervision, and performs indicated procedures with appropriate supervision.

PGY2:  The second year provides an opportunity for more independent activity.  The PGY2 takes on a leadership role and may function as a team leader.  In addition to ongoing learning, the PGY2 teaches first-year residents and students in the specialty focus.  The PGY2 makes more independent treatment decisions and performs indicated procedures and treatments with an attending consistently available for consultation.

PGY3:  The third year is considered the senior resident of the team, and the opportunity for leadership and independent responsibility increases considerably.  Indicated procedures and treatments are performed with attending backup consistently available for consultation.  The PGY3 may supervise more junior residents in the routine activities or the respective postgraduate years. Depending on the specialty focus, a portion of the year will include critical care and/or subspecialty experience.

PGY4 through PGY7:  Residents in training programs beyond the third year may include Chief Residents and/or residents who are concentrating on subspecialty graduate medical education.  The term "resident" includes individuals in approved subspecialty graduate medical education programs who historically have also been referred to as "fellows" by some sponsoring institutions.  These residents, while quite senior, are still considered residents and must be supervised by a supervising practitioner.  Graduated levels of responsibility, however, may allow a wide range of practice as determined by an evaluation of the resident's clinical experience, judgment, knowledge, and technical skill.  Ultimately, it is the decision of the supervising practitioner as to which activities the resident will be allowed to perform within the context of the assigned levels of responsibility.

**<u>Monitoring of Resident Supervision</u> (refer to current version of MCPM 11-106-XX for full direction)**

Elements of resident supervision will be monitored and reported to the Medical Executive Council.  Monitoring will include inpatient, outpatient, procedural, emergency, consultative and surgical care involving residents.

Program annual reports to the Resident Review Committee will include a review of quality improvement data (protected by Title 38 U.S.C. 5705 and its revised implementing regulations and VHA Directive 2002-043, July 18, 2002) such as:

1. Results of medical record reviews and other locally derived quality management data concerning patient care involving residents.
2. Incident reports and tort claims involving residents.
3. Risk events including adverse events and "near misses" involving residents
4. Patient complaints involving residents.
5. Review of externally derived quality management data such as External Peer Review Program
6. Review of reports by accrediting and certifying bodies.
7. Review of residents' comments related to their VA experience, if available.
8. Identification of opportunities for improvement in resident supervision and creation of action plans.
9. National Surgical Quality Improvement Project (NSQIP) data

An annual report on the residency training program as a whole from the Resident Review Committee to the Medical Executive Council will include:

1. Identification of medical, dental, optometric, and podiatric school affiliations.
2. Identification of facility and program leadership.
3. Accreditation status of programs and citations, if applicable.
4. Summary of facility monitoring activities for resident supervision.
5. Facility response to local or national information about resident experiences and perceptions.
6. Identification of opportunities for improvement with action plans.
7. Results of the VHA Learners' Perceptions Survey

**Joint Affiliation Partnership Council reports to the Medical Executive Council:**

The Joint Affiliation Partnership Council will report at least twice a year to the Medical Executive Council on issues and initiatives related to safety and quality of patient care, treatment and services provided by, and the related educational and supervisory needs of the participants in professional graduate education programs.

ROLE OF ATTENDING STAFF IN MEDICAL EDUCATION

**Supervising Practitioner duties include:**

Directing the care and management of the patient and providing the appropriate level of supervision based on the nature of the patient's condition, the complexity of care required, and the expertise and judgment of the resident being supervised.  Evidence of this level of supervision can be documented in the medical record by any of the following methods:

      a.    Progress note or other entry into the medical recorded by the supervising practitioner.

      b.    Addendum to the resident progress note by the supervising practitioner.

      c.    Countersignature of the progress note or other medical record entry by the supervising practitioner.

      d.    Resident progress note or other medical record entry documenting the name of the supervising practitioner with whom the case was discussed, a summary of the discussion, and a statement of the supervising practitioner's oversight responsibility with respect to the assessment or diagnosis and/or the plan for evaluation and /or treatment.

Evaluating each resident's performance on the basis of clinical judgment, knowledge, technical skills, humane qualities, professional attitudes, behavior and ability to manage the care of patients.

**New Admissions:**

The attending physician is responsible for seeing and examining the patient within 24 hours of admission and documenting, in a properly dated and signed progress note, concurrence with the resident's initial diagnoses and treatment plan.

**Continuing Care-- Expectations of Supervising Practitioners:**

Outpatient Clinic:

Each new patient to the outpatient clinic for which the supervising practitioner is responsible needs to be seen by or discussed with the supervising practitioner.  Return patients must be seen by or discussed with the supervising practitioner at such a frequency as to ensure that the course of treatment is effective and appropriate.  Any of the four types of documentation referenced in Supervising Practitioner's duties is acceptable.

Consultation:

A supervising practitioner is responsible for clinical consultations from each specialty service.  When residents are involved in consultation services the supervising practitioner is responsible for supervision of these residents.   Any of the four types of documentation referenced in Supervising Practitioner's duties is acceptable.

Acute Inpatient:

Supervising practitioners are expected to be personally involved in the ongoing care of the patients assigned to them in a manner consistent with the clinical needs of the patient and the graduated level of responsibility of the resident. Evidence of this level of supervision can be documented by any of the four types of documentation referenced in Supervising Practitioner's duties.

The supervising practitioner, in consultation with the resident, ensures that the discharge or transfer of a patient from the inpatient service is appropriate and based on the specific circumstances of the patient's diagnoses and therapeutic regimen; this may include physical activity, medications, diet, functional status and follow-up plans. Evidence of this assurance must be documented by the supervising practitioner's countersignature of the discharge summary or discharge note.

Operative/Invasive procedures:

Supervising practitioners must provide appropriate supervision for the patient's evaluation, management decisions, and procedures.  Determination of the level of supervision is a function of the level of responsibility assigned to the individual resident involved and the complexity of the procedure.

For all elective or scheduled surgical procedures, a supervising practitioner must evaluate the patient and write a pre-procedural note describing the findings, diagnosis, plan for treatment and /or choice of specific procedure to be done.  This pre-procedural evaluation and note may be done up to 30 days in advance of the surgical procedure.

Routine bedside and clinic procedures include: skin biopsies, central and peripheral lines, lumbar punctures, centeses, incision and drainage.  Supervision for these activities is dependent on the setting in which they occur.

Non-routine, non-bedside diagnostic or therapeutic procedures (i.e. endoscopy, cardiac catheterization, invasive radiology, chemotherapy, radiation therapy) are procedures that require a high level of expertise in their performance and interpretation.  Supervising practitioners are responsible for authorizing the performance of such procedures and must be physically present in the procedural area. Supervision takes into account the complexity and inherent risk of the procedure, the experience of the resident and assigned graduated level of responsibility.

**Emergency Situations:**

An emergency is defined as a situation where immediate care is necessary to preserve the life of or to prevent serious impairment of the health of a patient.  In such situations, any resident assisted by medical center personnel will, consistent with the informed consent policy, be permitted to do everything possible to save the life of a patient or to save the patient from serious harm.  The appropriate supervising practitioner must be contacted and apprised of the situation as soon as possible.  The resident must document the nature of that discussion in the patient's record.

**Collaborative Practice --Associate Medical Staff Members (refer to current version of MCPM 11-111-XX for full direction):**

Each patient shall be assigned a staff physician or an associate medical staff member.   All associate medical staff members shall collaborate with staff physicians when needed. Staff physicians must be familiar with each patient for whom they are consulted. Fulfillment of such responsibility requires involvement with such patients and each associate medical staff member who is requesting consultation. A responsible staff physician must be immediately available to the associate medical staff member by at least telephone and must be able to be present within a reasonable period of time if needed.

Associate medical staff members may be permitted to assume increasing levels of responsibility through credentialing, commensurate with their individual progress in experience, skill, knowledge, and judgment.  The

determination and documentation of graduated levels of responsibility in a functional statement or position description is the responsibility of the collaborating physician and the COS /Service Chief.


**MEDICAL RECORDS (refer to current version of MCPM 136-07-XX for full direction)**

**Inpatient Documentation**

    History and Physical Examination:

    A complete history and physical (H&P) examination will be performed and documented by a physician within twenty-four (24) hours of all acute care admissions.  In acute care, an initial inpatient H&P performed by an ARNP or Physician Assistant requires a confirmatory note by a physician.

    If a history and physical examination has been performed within thirty (30) days prior to admission and recorded in CPRS, a reference to this document will satisfy the initial H&P, provided any changes that may have occurred are recorded in the medical record at the time of admission.

    In Intermediate Medicine/Long Term Care, an H&P must be documented within 72 hours.

    Documentation Frequency:

    The frequency of physician progress notes will be determined by the Service Chief according to level of care and within the following guidelines:

        1.      Seriously ill patients should have at least daily or more frequent notes.
        2.      Acute inpatients should have notes at least daily.
        3.      Intermediate care patients will have notes at least every two weeks.
        4.      Patients residing in the Nursing Home and receiving chronic care on the psychiatry service will have notes at least monthly.
        5.      A progress note is required for transfer of patients to another bed section, for patients granted pass or leave privileges and for patients who leave against medical advice.

    Operative and Invasive Procedures:

    A complete history and physical will be performed and documented by a physician, ARNP or PA on all patients who are to undergo an operative procedure if this procedure will be performed under general, regional or spinal anesthesia or moderate or deep sedation in the operating room.  All H&Ps performed by an ARNP and PA are required to have a confirmatory note by the attending physician prior to the procedure.

    The attending must evaluate the patient and write a pre-procedure note describing the findings, diagnosis, plan for treatment, and/or choice of specific procedure to be performed.

    A history and physical exam must be recorded prior to performance of the surgery or procedure. In cases of an emergency when there is inadequate time to secure the history and physical, a brief note indicating the pre-operative diagnosis must be recorded.

    A pre-anesthesia assessment is performed for each patient before beginning moderate or deep sedation and before anesthesia induction.

    Intra-operative and post-operative monitoring is documented.

    The brief procedure/operative note is written immediately after the procedure/surgery and must include: findings; procedures; specimen removed; post-op diagnosis; and name of surgeon/assistant.

Operative reports will be dictated immediately following the procedure and transcribed within one day and placed on the patient's active record for signature.

Procedure reports will be documented immediately following the procedure.

Procedures performed under local anesthesia or no anesthesia in the Emergency Room, Dental Clinic, Dermatology Clinic, or any other outpatient setting will **only require** a review of the medical history, Consent, and appropriate procedure documentation.

An abbreviated history and physical may be performed for invasive diagnostic tests and other invasive procedures performed with or without intravenous sedation outside the Operating Room. The abbreviated H&P performed by a Physician Assistant/ARNP must have an addendum or a stand alone note by an attending physician.

Discharge Summaries:

Discharge summaries for patients hospitalized over forty-eight (48) hours will be dictated prior to or as early as possible prior after the patient's discharge.

Discharge summaries for death cases or irregular discharges will be dictated within twenty-four (24) hours.

Discharge summaries for patients hospitalized for forty-eight (48) hours or less or for a twenty-three (23) hour observation will be completed at the time of the patient's discharge and documented on the electronic forty-eight hour short form/observation template.

Any medical records not completed by the medical staff within thirty (30) calendar days of the patient's discharge will be termed delinquent.

Delinquent Medical Records Procedures:

Weekly reports of delinquent medical records requiring dictation are distributed to Service Chiefs. Monthly report of outstanding medical records for each clinical service are reported to the Service Chiefs.  Any physician who fails to respond to notification of outstanding medical records may be subject to administrative and/or disciplinary action by the appropriate Service Chief.

**Outpatient Documentation**

Outpatient medical records for patients will include a summary list of: known medical diagnoses and conditions; known significant operative and invasive procedures; known medications; and known drug allergies and adverse drug reactions.

An electronic progress note pertinent to the level of care required will be documented at the time of each ambulatory care visit.

An electronic encounter form will be completed for each patient encounter.

**Patient Safety Goals**

**Universal Protocol  (Refer to current version of MCPM 112-02-XX for full direction)**

This Protocol applies to all operative and other invasive procedures that expose patients to more than minimal risk, including procedures done in settings other than the operating room such as a special procedures unit, endoscopy unit, interventional radiology suite or the bedside.  The following are the required steps:
- Pre-operative verification process
  - An ongoing process of information gathering and verification, beginning with the determination to do the procedure, continuing through all settings and interventions involved in the preoperative preparation of the patient, up to and including the "time out" just before the start of the procedure.  This encompasses the informed concept process as well.
- Marking the operative site
  - The intended site must be marked such that the mark will be visible after the patient has been prepped and draped.   Acceptable marks are "yes" or "correct site" along with the provider's initials.
  - Pt marking must be performed by a provider member of the procedure team.
  - Non-operative sites should never be marked
  - Site marking should be done prior to moving the patient into the room where the procedure will be done
- "Time out" immediately before starting the procedure
  - To conduct a final verification of the correct patient, procedure, site, patient positioning, imaging and as applicable, implants.
  - The "time out," or immediate preoperative pause, must occur in the location where the procedure is to be done
  - The "time out" must involve the entire team, and requires active participation by all team members.  It must be conducted in a "fail-safe" mode, i.e., the procedure is not started until any questions or concerns are resolved.
  - Even when there is only one person doing the procedure, a brief pause to confirm the correct patient, procedure, and site is appropriate. It is not necessary to engage others in this verification process if they would not otherwise be involved in the procedure.
  - **The "time-out" must be documented.**


**Medication Reconciliation (Refer to MPCM 119-34-XX for full direction)**

Medication Reconciliation is the process of comparing the medications that the patient has been taking prior to the time of admission or entry to a new setting with the medications that the patient is about to receive.  The purpose of the reconciliation is to avoid errors of transcription, omission, duplication of therapy, drug-drug and drug-disease interactions, etc.
- Medications must be accurately and completely reconciled across the continuum of care.
- MVAHS must maintain an up to date list of the patient's medications at all times, and must manage this list with the participation of the patient (when possible)
- When a patient changes setting, (ie, admission, transfer, discharge, procedures, ER visit etc) if medications are to be used, or the patient's response to the treatment or service could be affected by medications that the patient has been taking, medication reconciliation must occur.
- The complete list of medications must be provided to the patient on discharge from the facility.
- The complete list of medications must be communicated to the next provider of service when a patient is referred or transferred to another setting, service, practitioner or level of care within or outside the organization.

**Hand-off Communication (Refer to MPCM 00-112-XX for full direction)**

Hand-off Communication is an interactive process of passing current, need-to-know, patient-specific information from one care provider to another for ensuring continuity of the patient's care.
Hand-offs, can include, but are not limited to nursing shift changes, physicians transferring complete responsibility for a patient, physicians transferring on-call responsibility, temporary Responsibility for staff leaving the unit for a short time, anesthesiologist report to post-anesthesia recovery room nurse, nursing and physician hand off from the emergency department to inpatient units, different hospitals, nursing homes and home health care, critical laboratory and radiology results sent to physician offices, etc.

- The receiver of the information assuming the care of the patient **must** have an opportunity to ask and respond to questions to the giver of the information.
- Hand-off communication must, at a minimum, include the following information as appropriate:
  - Patient identifiers Diagnosis, (DNR) /Code status, Isolation requirements, Fall risk, Elopement/wandering risk, Mentation, Presence of Guardian of Person (Plenary Guardian), Recent changes in patient's condition, Anticipated changes in patient's condition.

**Critical Tests and Critical Values (Refer to MPCM 11-03-XX for full direction)**

Critical Tests are defined as those Tests ordered as STAT.  Critical Values are panic values requiring some type of timely intervention.  Critical Values are defined by the respective service, i.e. Lab, Imaging, Nuclear Medicine, Cardiology, etc.

MVAHS has defined the acceptable length of time between the ordering of critical tests and the availability of results and values, as well as the acceptable length of time between the availability of critical results/values and receipt by the responsible licensed care giver.   The actual time frames are monitored for compliance with the facility defined expectations, and performance improvement efforts are initiated when performance falls below the expected standard.

When critical results are communicated to a provider, they must provide **"read back"** to the individual providing the critical results.  This entails **writing down** the information, **reading it back,** and **obtaining confirmation** from the individual issuing the information.